UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SCOTT ADAMS,<br><br>  Plaintiff,<br><br> v.<br><br>CITY OF WILMINGTON, et al.,<br><br>  Defendants. | No. 22 CV 3669<br><br>Judge Manish S. Shah |

MEMORANDUM OPINION AND ORDER

Plaintiff Scott Adams's neighbor called 911 to report Adams knocking on her door while holding a knife. Wilmington Police Officers Jurgens, Brimer, Campos, and Runions responded to the call. While arresting Adams, Officer Jurgens grabbed Adams's left arm by the wrist and pulled it behind Adams's back. Adams felt his arm come loose at the elbow. He was treated at the hospital for a dislocated elbow. Adams brings this suit under 42 U.S.C. § 1983 against Officer Jurgens for excessive use of force in violation of the Fourth Amendment. He brings a state-law claim for battery under a theory of *respondeat superior* against the City of Wilmington and seeks indemnification. Defendants move for summary judgment. For the reasons discussed below, the motion is denied

I. **Legal Standard**

A motion for summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict in favor of

the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I view all the facts and draw reasonable inferences in favor of the non-moving party to determine whether summary judgment is appropriate. *See Uebelacker v. Rock Energy Coop.*, 54 F.4th 1008, 1010 (7th Cir. 2022).

II. Facts

    A. The First Encounter: Adams's 911 Call

Scott Adams called 911 after suspecting a back window in his home showed signs of forced entry. [45] ¶¶ 2–3.[1] Wilmington Police Department Officers Jurgens and Brimer responded to the call and arrived around 5:22 p.m. [45] ¶¶ 2, 4. Adams let the officers into his home and showed them the damaged window. [45] ¶ 6.

Jurgens and Brimer saw that Adams was moving slow; his voice was raspy and quiet; he did not appear to be in crisis; there was no indication that he was confused or having difficulty understanding things. [45] ¶ 7. Adams had been in the hospital for a medical procedure. [45] ¶ 3. His legs were wrapped in ACE bandages, and he had trouble talking because of a sore throat from a tube inserted during his

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page numbers. The facts are taken from plaintiff's responses to defendant's Local Rule 56.1 statements, [42], and defendants' responses to plaintiff's statement of additional facts, [45], where both the asserted fact and response are sent forth in one document. An asserted fact that is not controverted by reference to specific, admissible evidence is deemed admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statement of facts. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006). To the extent that the parties rely on characterizations of testimony, I omit the characterizations and cite to the underlying evidence when possible. *See, e.g.*, [42] ¶ 11; [45] ¶ 7. The parties dispute many facts, but most of the facts in those disputes are not material. To the extent disputed facts are relevant and the parties rely on admissible evidence, I include them in the light most favorable to plaintiff.

2

procedure. [45] ¶ 3. Jurgens learned from dispatch that Adams had come home from the hospital due to a medical issue, but the officers did not ask about the medical problem. [45] ¶ 5; [33-1] at 64:22–65:8. The officers did not perceive Adams as a threat. [45] ¶ 7. Brimer observed that Adams was not acting abnormally. [45] ¶ 7. The officers thought Adams was being overcautious, but his behavior did not indicate to the officers that police would have to return. [45] ¶ 7. The officers left Adams's home at 5:36 p.m. [45] ¶ 6.

B. The Second Encounter: Neighbor's 911 Call

After the officers left, Adams walked across the street to his neighbor's house to ask them if they had seen any suspicious activity. [45] ¶ 8. He was holding a kitchen knife.[2] [45] ¶ 9. Adams's neighbor called 911 to report that Adams was outside with a knife knocking on the door and that he would not stop. [42] ¶¶ 2–3.

Adams heard his neighbor call the police, so he placed the knife on the neighbor's windowsill and walked toward the street. [45] ¶¶ 10–11; [34-2] at 39:16–39:22. Officers Jurgens and Campos were the first two officers to respond to the scene. [42] ¶ 4; [45] ¶ 12. By the time the officers had arrived, Adams had already placed the knife on the windowsill. [45] ¶ 11. Adams walked in the direction of the officers. [42] ¶ 5. He did not have the knife in his hands, and neither Jurgens nor Campos saw a knife in his hands. [42] ¶ 6; [45] ¶¶ 15–16.

---

[2] The parties dispute the size of the kitchen knife. Adams described it as a "little knife, kitchen knife." [34-2] at 29:2–39:4. Defendants cite a photograph of the knife on the windowsill to show it was not a "small" knife. *See* [45-1]. The photo depicts what appears to be an 8" chef's knife. There's no evidence that the officers knew any details about the knife before Jurgens used force against Adams, so the dispute over its size is immaterial.

3

As Adams approached the street, Jurgens drew his taser. [42] ¶ 8. Jurgens ordered Adams to stop and put his hands up. [45] ¶ 17. Adams stopped about 15 feet away from Jurgens and put his hands above his head in a standing position. [45] ¶ 17. Jurgens then ordered Adams to "get down, face down, on the pavement."[3] [42] ¶ 10; [45] ¶ 18; [34-1] at 40:14–40:15. Adams testified that he attempted to comply but had difficulty: "[M]y knees were so stiff that I got, like, almost, like, a lineman in football. But I had four points of contact on the pavement." [34-1] at 40:16–40:17. Jurgens holstered his taser, approached Adams's left side, grabbed Adams's left arm (just above the wrist), and pulled the arm back. [42] ¶ 13; [45] ¶ 25. Adams felt something come loose at his elbow and immediately felt pain. [45] ¶ 27. Officer Campos grabbed Adams on Adams's right side. [42] ¶ 16. The officers spun Adams around and dragged him onto adjacent grass. [42] ¶ 17; [45] ¶ 28. Campos kicked Adams foot from beneath him, and Adams fell on his butt. [45] ¶ 28.

At this point, Officer Brimer's dashboard camera footage depicts events that are not in dispute in this case. [45] ¶¶ 29–30; [37] (Brimer dashcam footage).[4] Adams was on the ground after a leg sweep by Campos, at which point Officers Runions and

---

[3] Adams objects to defendants' assertion that he was told to "get down, face down on the pavement," and says that he was only ordered to get down on the ground. *See* [42] ¶ 10 *and* [45] ¶ 18. But Adams testified that he was told to "get down, face down, on the pavement." [34-1] at 40:14–40:15. Jurgens testified that he "ordered [Adams] to get down on the ground." [33-1] at 82:21. The difference between the two versions of the officer's command does not affect the outcome at this stage but presents a credibility question for the jury that may bear on Jurgens's reasonable belief of the threat Adams posed.

[4] There are two links to defendants' digital exhibits. *See* [37]. The first link is the dashboard camera footage from Brimer's squad car. The second link is the dashcam footage from the second squad car that pulled up to the scene (behind Brimer's car). The parties cite to the Brimer dashcam footage.

4

Brimer arrived on the scene. [45] ¶ 31. Adams was wailing in pain—complaining about pain in his shoulder, difficulty breathing, something biting him, and having snakes on him. [42] ¶ 33; [45] ¶ 32. Over the course of two minutes, Runions handcuffed Adams, Brimer placed leg restraints on Adams's legs, and Brimer called an ambulance for a psychological evaluation. [42] ¶¶ 22–31.

Adams was transported to a hospital. [45] ¶ 39. He was diagnosed with a subluxed/dislocated left elbow, which was reduced by a doctor. [45] ¶ 39. Adams was not charged with any crime following the arrest. [45] ¶ 40.

Adams brought this suit against Officers Jurgens, Campos, Runions, and Brimer under 42 U.S.C. § 1983 for excessive force and failure to intervene in violation of the Fourth Amendment. [1] ¶¶ 15–24. Adams voluntarily dismisses his claims against Campos, Brimer, and Runions. [41] at 6. He proceeds only with the excessive-force claim against Jurgens. [41]. He also brings a state-law claim for battery under *respondeat superior* against the City of Wilmington and seeks indemnification. [1] ¶¶ 25–31.

### III. Analysis

Adams does not argue that the officers lacked probable cause to arrest him. *See* [41]. Adams's excessive-force claim is based on a single use of force: Officer Jurgens grabbing Adams's left arm by the wrist with enough force to dislocate Adams's left elbow. [41] at 1.

#### A. Waiver or Forfeiture of Qualified Immunity

Defendants did not plead qualified immunity as an affirmative defense in their answer to Adams's complaint. [5]. "A defendant's failure to plead an affirmative

5

defense may result in a waiver of the defense if the defendant has relinquished it knowingly and intelligently, or forfeiture if the defendant merely failed to preserve the defense by pleading it." *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 478 (7th Cir. 2019). Defendants now raise qualified immunity in their motion for summary judgment. They explain that Adams's complaint did not make clear that qualified immunity was applicable because Adams's version of events changed after his deposition, including information about him holding a knife. [44] at 3. Opting not to plead qualified immunity was not an intentional relinquishment of the defense. At the time of the answer, defendants did not know that Adams was not alleging an absence of probable cause and did not know that Adams was conceding the presence of a knife. *See* [1] ¶ 6. Defendants did not knowingly forgo the defense on new facts. Nor was the failure to plead the defense a forfeiture. Generally, a defendant's failure to plead an affirmative defense in the answer constitutes forfeiture "only if the plaintiff is harmed by the defendant's delay in asserting it." *Reed*, 915 F.3d at 478 (citation omitted). In this case, defendants' assertion of qualified immunity does not introduce new factual or legal issues to the case, and Adams has adequately responded to the defense in his response brief. There is no prejudice to Adams to consider the application of qualified immunity now.

### B. Excessive Force

The Fourth Amendment "guarantees citizens the right to be secure in their persons … against unreasonable ... seizures of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989). To determine what constitutes a "reasonable seizure" a reviewing court must examine the totality of the circumstances "from the perspective

6

of a reasonable officer on the scene" paying "careful attention to the facts and circumstances of each case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. This is an objective analysis, where the court must "balanc[e] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* An officer's subjective beliefs and motivations are irrelevant. *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018).

Another, related issue is whether Jurgens is entitled to qualified immunity for his use of force. Government officials are entitled to qualified immunity unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *D.C. v. Wesby*, 583 U.S. 48, 62–63 (2018). This is a two-step analysis, and a reviewing court may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Adams "bears the burden of defeating it either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 723–24 (internal citation omitted). For a right to be "clearly established," "the contours of the right must be sufficiently

7

clear that a reasonable officer would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

When Adams approached Jurgens during their second encounter, Jurgens knew that: Adams was the same man Jurgens and Brimer had encountered less than half an hour earlier in response to Adams's 911 call; Adams was the subject of the second 911 call made by his neighbor about a man holding a knife; the officers did not see Adams holding a knife in his hands as he approached. *See* [42] ¶¶ 2–3, 6; [45] ¶¶ 15–16. Adams says that his first encounter with Jurgens and Brimer when Adams called 911 should have put Jurgens on notice that Adams was not a threat, was always cooperative, and was never armed. [41] at 11. But the second 911 call from Adams's neighbor reported that Adams had a knife and was knocking on his neighbor's door—this was a different context than the earlier 911 call from Adams. *See Smith v. Ball State Univ.*, 295 F.3d 763, 770 (7th Cir. 2002) ("When police officers face what is essentially a fluid situation, they are entitled to graduate their response to meet the demands of the circumstances confronting them."). While Jurgens testified that he knew Adams had been in the hospital during their first encounter, there's nothing in the record to establish that Adams told the officers he had a medical procedure that resulted in mobility issues. Jurgens did not know that Adams placed his knife on a windowsill and did not have it on his person as he approached Jurgens—Adams does not assert that he placed the knife on the windowsill in view of Jurgens. Both Jurgens and Campos testified that they did not see Adams holding a knife when Adams approached them during the second encounter, but this does not

8

make Jurgens's belief that Adams may have had the knife concealed on his body objectively unreasonable given the descriptions from the 911 call. [42] ¶ 7; *see Smith v. Finkley*, 10 F.4th 725, 738 (7th Cir. 2021) (finding officers reasonably believed that suspect was armed with a gun based on a report from dispatch even though suspect did not have a gun in his hand).

There's no dispute that Adams complied with Jurgens's first order to stop and put his hands up. [42] ¶ 9; [45] ¶ 17. The parties dispute whether—and to what degree—Adams complied with Jurgens's subsequent order to "get down, face down, on the pavement." [34-1] at 40:14–40:15. Whether Adams was complying with Jurgens's order informs the critical question of whether Jurgens's use of force to grab Adams's left elbow by the wrist was reasonably justified to effectuate the arrest. Jurgens testified that use of force is not appropriate if a suspect complies with a police command. [45] ¶ 21. He also testified that if Adams had gotten down on all fours, then Adams would have been complying with his order and force would have been unnecessary. [45] ¶ 22.

An officer may use no more than minimal force on a suspect who is only passively resisting arrest.[5] *See Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020) ("Unlike when someone is passively refusing to move or follow lawful

---

[5] Defendants argue that "subdued" generally means "handcuffed" or "otherwise restrained so that the suspect lacks any means of evading custody." [44] at 12 (citing *Austin v. City of Pasadena, Texas*, 74 F.4th 312, 326 (5th Cir. 2023)). In *Miller*, the Seventh Circuit court of appeals described the arrestee as subdued where he was "lying motionless and spread-eagled on the ground." 761 F.3d at 829. While handcuffs or restraints may support a finding that an arrestee was subdued at the time force was applied, they are not necessary conditions. In other words, Adams could have been subdued even though he hadn't yet been handcuffed or restrained.

9

commands, the police may use significant force to subdue someone who is actively resisting lawful detention."); *Abbott*, 705 F.3d at 732 ("[O]nly a minimal amount of force may be used on [passively resisting suspects]."); *Taylor v. City of Milford*, 10 F.4th 800, 808 (7th Cir. 2021) ("[C]ontinuing to apply unnecessary force against a civilian once he is already subdued may be an unreasonable use of force."); *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (suspect demonstrated "only passive resistance" when he was lying with his arms outstretched and obeying every order except for the order to put his hands behind his back); *see also Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014) (citing *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009)) ("A person has the right to be free from an officer's knowing use of handcuffs in a way that would inflict unnecessary pain or injury, if that person presents little or no risk of flight or threat of injury… [K]nowledge may be inferred 'from the nature of the act itself.'"). The "prohibition against significant force against a subdued suspect applies notwithstanding a suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon." *Miller*, 761 F.3d at 829.

The line between minimal and significant force is ill-defined. *See Bass v. Dakuras*, No. 19 CV 7557, 2023 WL 5580416, at *9 (N.D. Ill. Aug. 29, 2023) ("The Seventh Circuit has not fleshed out the boundary between significant and minimal force. More commonly, it has said what minimal force is not."); *Phillips v. Community Ins. Corp.*, 678 F.3d 513, 522 (7th Cir. 2012) (polyurethane shots "plainly exceeded" minimal force); *Smith*, 295 F.3d at 766, 770 (failed attempt at knee strike while

removing nonresponsive driver from car was a minimal use of force). Defendants cite to *Curd v. City Ct. of Judsonia, Arkansas*, 141 F.3d 839, 841 (8th Cir. 1998), for the proposition that an officer seizing an arm to effect an arrest is "so low on the scale" of force that such force is not unreasonable even if it was unnecessary. But the Eighth Circuit noted in *Curd* that there was no evidence that the plaintiff was injured or experienced physical pain from the arm seizure. *See id.* Here, Jurgens seized Adams's arm in a way that resulted in more than just pain—he suffered from a dislocated elbow. Based on the undisputed extent of injury to Adams's arm, the amount of force used by Jurgens was more than minimal.

Adams testified that he attempted to comply with Jurgens's order but had difficulty because of his medical condition: "[M]y knees were so stiff that I got, like, almost, like, a lineman in football. But I had four points of contact on the pavement." [34-1] at 40:16–40:17. Adams does not assert that he told Jurgens and Campos that he was having difficulty getting on the ground because of his stiff knees. An officer may reasonably mistake a suspect's medical symptoms as resistance. *See Turner*, 979 F.3d at 570. In *Smith v Ball State Univ.*, officers suspected an unresponsive driver of intoxicated driving and used force to remove him from the car; another officer attempted a failed knee strike while two other officers pulled the driver out. 295 F.3d at 770–71. The driver was in diabetic shock, but the court found it to be a reasonably mistaken belief that the driver was resisting arrest. *Id.* at 771. The court concluded: "Although we accept as true the fact that Smith was not actively resisting, a reasonable officer who happened on the scene could reasonably misconstrue Smith's

11

unresponsiveness as resistance requiring the minimal use of force." *Id.* Here, Jurgens did not know that Adams's earlier hospital visit restricted mobility in his legs and impacted his ability to quickly and fully comply with Jurgens's order. Jurgens's belief that Adams was resisting arrest was reasonable in the light of these circumstances. While *Smith* supports Jurgens's reasonable belief that *some* force was necessary, the court in *Smith* did not consider whether such a reasonable belief supports the use of more than minimal force.

Defendants further contend that a football lineman assumes a "four-point stance" because such a position allows a player to explode forward with maximum leverage. [32] at 14. So, Adams posed an active threat to the officers even though Adams had four points of contact with the ground. But this would require me to accept defendants' characterization of Adams's body language/positioning—and a jury would be entitled to conclude otherwise. Adams's admission about Jurgens's order and the undisputed fact that Adams never made full contact with his face down on the pavement could lead a jury to conclude that Adams was not complying with Jurgens's order and that Adams maintained the leverage to move suddenly. In other words, Adams was neither passively resisting nor subdued. But no conclusive inference is apparent from the record. A jury might find Adams credible and find that he was, at most, passively resisting when Jurgens applied force to grab Adams's left arm. In response to a passively resisting suspect who did not pose an active threat, Jurgens's use of force would be unreasonable.

12

These disputes of material fact—whether Adams was resisting arrest and whether Adams was crouched in a position that posed an active threat—also preclude determination of the qualified immunity question. Defendants argue that Adams fails to identify a sufficiently analogous case to defeat qualified immunity. They cite to *Burns v. Adams Cnty. Sheriff*, No. 1:18CV160, 2020 WL 7059833 (N.D. Ind. Dec. 2, 2020) to demonstrate that the "constitutional bright line" between unlawful and lawful force in pulling an arrestee's arm to handcuff them is hazy. [44] at 7. In *Burns*, an officer pushed the plaintiff against a wall and began to cuff her after she failed to follow the officer's order to exit out of an apartment. 2020 WL 7059833, at *6–*8. The court found the officer's use of force was objectively reasonable because the officer used minimal force that resulted in temporary pain and did not use handcuffs in a manner that would clearly injure or harm a typical arrestee. *Id.* at *7. The court determined that "[i]t would not clearly injure or harm a typical arrestee to pull the arrestee's arm down and behind their back in order to cuff them, which is in most cases necessary in order to handcuff someone." *Id.* Certainly, an officer pulling an arrestee's arm is necessary to effectuate handcuffing during an arrest. *See Graham*, 490 U.S. at 396 ("[T]he right to make an arrest… necessarily carries with it the right to use some degree of physical coercion."). In this case, however, Jurgens pulled Adams's arm with enough force to dislocate Adams's left elbow. This was more than a mere push or shove and takes Jurgens's conduct outside of the "hazy" borderline.

As discussed above, clearly established law in this circuit prohibits the use of significant force on suspects who are passively resisting arrest. In the context of an

officer's use of force while handcuffing an arrestee, it's clearly established that an officer may not "violently yank" a suspect's arm to handcuff them if they do not resist arrest or pose a safety threat. *See Payne v. Pauley*, 337 F.3d 767, 780 (7th Cir. 2003) (unlawful for an officer "to use excessively tight handcuffs and violently yank the arms of arrestees who were not resisting arrest, did not disobey the orders of a police officer, did not pose a threat to the safety of the officer or others, and were suspected of committing only minor crimes"). Some of the cases that Adams relies on involve facts that defendants argue make them insufficiently analogous for purposes of the qualified immunity analysis. For example, the arrestee in *Gupta v. Melloh* was publicly intoxicated (a crime that the court found "not at all severe") and already handcuffed when an officer pulled on the plaintiff's arm causing him to fall and fracture a vertebra in his neck. 19 F.4th 995, 1000–01 (7th Cir. 2021). But a case does not need to directly be on point for a right to be clearly established. *Phillips*, 678 F.3d at 528. And *Gupta* reiterated that "case law has long put police officers on notice that… significant force is unreasonable after a suspect is subdued or has stopped resisting or evading arrest or is, at most, passively resisting arrest." 19 F.4th at 10001. Until material factual disputes are resolved by a jury about Adams's compliance, resistance, and the threat he posed, the question of qualified immunity cannot be resolved in favor of Officer Jurgens.

### C. Battery

Adams also brings a claim against the City of Wilmington for battery under a *respondeat superior* theory of liability. Under the Illinois Tort Immunity Act, a police officer "is not liable for his act or omission in the execution or enforcement of any law

14

unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. The City of Wilmington cannot be held liable "for an injury resulting from an act or omission of its employee where the employee is not liable." *See* 745 ILCS 10/2-109. "Willful and wanton" is defined by the Act as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210. "While a defendant's conduct may be both 'unreasonable' and 'willful and wanton,' these words are not interchangeable." *Carter v. Chicago Police Officers*, 165 F.3d 1071, 1081 (7th Cir. 1998).

Here, a jury could conclude that Jurgens's use of force reflected a reckless disregard to Adams's safety if the jury finds that Adams was passively resisting or subdued when Jurgens applied the force. *See Chelios v. Heavener*, 520 F.3d 678, 693 (7th Cir. 2008) (finding that a jury could conclude an officer's arrest and tackling was a "calculated display of force" if the jury accepted arrestee's version of facts).

### D.     Indemnification

Because disputed issues of material fact prohibit the resolution of Adams's claim for excessive force against Officer Jurgens, the indemnification claim against the City of Wilmington remains pending. *See* 745 ILCS 10/9-102.

## IV. Conclusion

Defendants' motion for summary judgment, [31], is denied.

ENTER:

                                               */s/ Manish S. Shah*
                                               Manish S. Shah
                                               United States District Judge

Date: September 30, 2024